[Cite as *United Assn. Local 168, Apprentice Educational Fund v. Robinson*, 2025-Ohio-2421.]

# IN THE COURT OF APPEALS OF OHIO
## FOURTH APPELLATE DISTRICT
## WASHINGTON COUNTY

|  |  |  |
|---|---|---|
| UNITED ASSOCIATION LOCAL 168, APPRENTICE EDUCATIONAL FUND, | : | |
| | : | |
| | : | |
| | : | |
| Plaintiff-Appellant, | : | Case No. 23CA9 |
| | : | |
| v. | : | |
| | : | DECISION AND |
| DOLAN ROBINSON, | : | JUDGMENT ENTRY |
| | : | |
| Defendant-Appellee. | : | |

_____
## APPEARANCES:

Jonah D. Grabelsky and Joseph C. Hoffman, Jr., Faulkner, Hoffman & Phillips, LLC, Cleveland, Ohio, for Appellant.

Tyler Tarney and Eric Leist, Gordon Rees Scully Mansukhani, LLP, Columbus Ohio, for Appellee.

_____

Smith, P.J.

{¶1} Appellant, United Association Local 168, Apprentice Educational Fund (hereinafter "JATC") appeals from a judgment of the Washington County Court of Common Pleas granting summary judgment in favor of Dolan Robinson, appellee, in an action concerning a scholarship loan agreement executed by the parties providing for the training and education for Robinson as a union apprentice.[1]

---

[1] We are referring to Plaintiff-Appellant as "JATC" throughout because it was the Board of Trustees of the United Association Local 168 Apprentice Educational Fund that brought the underlying breach of contract action below.

JATC challenges the trial court's grant of summary judgment in favor of Robinson as to JATC's breach of contract claim. On appeal, JATC raises four assignments of error, contending 1) that the trial court erred in determining that the relevant provisions of the parties' scholarship loan agreement (hereinafter "SLA") constitute an unenforceable liquidated damages penalty; 2) that the trial court erred in determining that it had breached the scholarship loan agreement; 3) that the trial court erred in determining that the parties' scholarship loan agreement contained an unenforceable non-competition agreement; and 4) that the trial court erred in determining that Robinson had adequately set forth his claims in his answer to JATC's first amended complaint.

{¶2} We disagree with JATC's first argument because we conclude the trial court correctly held the repayment provision contained in the SLA was an unenforceable penalty; however, we further conclude that the trial court erred in granting JATC no damages at all, rather than its actual damages. Thus, JATC's first assignment of error is overruled in part and sustained in part. Further, we agree with JATC's arguments that the trial court erred in determining that it had breached the SLA and also that the SLA contained an unenforceable non-competition agreement. As a result, JATC's second and third assignments are both

---

Further, in the first paragraph of the first amended complaint, Plaintiff-Appellant refers to itself as "JATC," which stands for "Joint Apprenticeship and Training Committee," as stated in ¶ 3 of the first amended complaint. Additionally, as set forth in the first amended complaint, JATC "is an ERISA Fund as defined in Section 3(1) of the Employee Retirement Income Security Act of 1974, 29 U.S.C. § 1002(1)."

sustained. Finally, we disagree with JATC's argument that the trial court erred in determining that Robinson had adequately set forth his claims in his answer to JATC's first amended complaint. Therefore, JATC's fourth assignment of error is overruled.

{¶3} In summary, we overrule in part and sustain in part JATC's first assignment of error. We also overrule JATC's fourth assignment of error. However, we sustain JATC's second and third assignments of error. Accordingly, the judgment of the trial court is affirmed in part, reversed in part, and remanded for further proceedings consistent with this opinion. More specifically, on remand, the trial court is instructed to hold a hearing to determine JATC's actual damages sustained as a result of Robinson's breach of the SLA.

## FACTS

{¶4} Dolan Robinson is a former apprentice in the plumbers and pipefitters apprenticeship program associated with the United Association Local 168 Apprenticeship Education Fund, which is known as JATC. The record indicates that "JATC is a jointly administered, multiemployer welfare benefit plan under Section 3(1) and (37) of the Employee Retirement Income Security Act, as amended ("ERISA"), 29 U.S.C. § 1002(1) and 29 U.S.C. § 1002(37)." JATC's apprenticeship program is a five-year program that is registered with the Ohio Department of Job and Family Services through the Ohio State Apprenticeship

Council.  JATC is funded by contributions from employers who are signatories to various collective bargaining agreements with the union.

{¶5} Robinson actually became affiliated with JATC when he attended high school at the Mid-East Career and Technology Center.  Robinson signed a letter of intent to obtain a spot in the school-to-apprentice program (hereinafter "STA program") after JATC representatives visited Mid-East.  The program allows high school seniors to participate in the program and earn one year's worth on-the-job training (hereinafter "OJT") and related technical instruction (hereinafter "RTI") during their senior year.[2]  Upon graduation in 2019, Robinson chose to join the apprenticeship program.  As part of his orientation in August of 2019, Robinson signed a scholarship loan agreement (hereinafter "SLA").  He signed a second SLA upon commencement of his second year of his apprenticeship in August of 2020 as well.

{¶6} The SLA essentially stated that JATC would provide the apprentice with $40,000 worth of education and training during the five-year term of the apprenticeship.  Upon completion of the apprenticeship, the apprentice is obligated to repay the loan to JATC either in cash or by in-kind credits.  Such in-kind credits were to be earned by going to work for a union employer that either contributes to

---

[2] The apprenticeship program requires that apprentices obtain, over the course of the five-year apprenticeship, 8,500 hours of OJT and 1,230 hours of RTI.  RTI is completed on-site at JATC's training facility.  Apprentices are required to obtain 123 hours of RTI every six months, but the requirement may be temporarily suspended if work travel prohibits attendance at RTI.

JATC or to a different JATC in another locale. Further, in order to receive in-kind credit, the apprentice must work a minimum of 1,500 hours during each year for a minimum of three calendar years. After five years of qualifying work, the $40,000 is considered fully repaid.

{¶7} The SLA also contained provisions governing repayment in the event of breach, which are relevant to the present matter and will be discussed more fully below. Suffice it to say at this juncture, the SLA provided that apprentices shall not seek or accept employment with non-union, non-contributing employers and in the event that happens, any amount due and owing under the scholarship loan agreement must be immediately repaid. It is this provision that ultimately led to the filing of the underlying breach of contract action by JATC against Robinson.

{¶8} Upon commencement of his formal apprenticeship training after he graduated from high school, Robinson went to work for Pioneer Pipe, Inc., located in Marietta, Ohio, where he worked until May of 2020. Although Robinson claims that the work he was performing at Pioneer Pipe did not involve any pipefitting or welding, Jeff Smith, the program coordinator for JATC, confirmed in his deposition that Robinson was awarded OJT credit for the time he worked at Pioneer Pipe. Robinson then went to work for Grae-Con Process Piping LLC in May of 2020, where he worked until February of 2021, with two intervening lay-offs. Robinson also received OJT for his working at Grae-Con. Just shy of one

month after his lay-off from Grae-Con, Robinson was offered a job from a union employer that was located approximately two hours away, which would have required overnight travel, and which would have prevented him from completing his RTI requirement. Robinson turned the job down and was unemployed for approximately another month until he accepted employment with Surgent Construction, LLC, a non-union and non-contributing employer providing services at the Colgate-Palmolive facility, located in Cambridge, Ohio. Robinson performed structural steel welding while working for Surgent, where he still remained employed at the time of the trial court proceedings.

{¶9} Because Robinson began missing RTI classes in March of 2021 after he began his employment with Surgent, he accrued over 15 points under the SEPS, which is the self-eliminating-point-system tied to the attendance requirements of the apprenticeship program. Robinson was terminated from the program for non-attendance on April 15, 2021, by letter. His termination was formally approved at JATC's next meeting held on May 3, 2021. Thereafter, on June 18, 2021, JATC sent Robinson a letter demanding that he repay the full value of the scholarship loan, plus attorney's fees, as provided for in the SLA, which JATC stated was $40,423.75. When Robinson did not comply, JATC initiated litigation.

{¶10} JATC filed a complaint alleging a breach of contract in the Washington County Court of Common Pleas on September 27, 2021. JATC's

initial complaint was followed by the filing of a first amended complaint on October 12, 2021. JATC essentially alleged that Robinson breached the terms of the SLA by leaving the training program and beginning work for a non-union contractor in Cambridge, Ohio. JATC claimed Surgent was in the business of construction and that Robinson's employment with Surgent involved "general mechanical, plumbing or pipefitting work or any other work covered by the Constitution of the United Association of Journeymen and Apprentices of the Plumbing and Pipefitting Industry of the United States and Canada, AFL-CIO." The complaint further alleged that Robinson's employment with Surgent "had not been performed under the terms of the UA local union collective bargaining agreement that provides for the payment of contributions by such employer to the JATC or another UA Joint Apprenticeship or Training Committee." JATC alleged that Robinson's acceptance of employment with Surgent "constituted an immediate breach of the Agreement [SLA]."

{¶11} JATC demanded "all amounts due and owing on the scholarship loan * * * together with interest at the annual rate of five percent (5.0%), compounded monthly, from the date of this Agreement, and all costs of collection, thereof, including reasonable attorney fees and all court costs." In total, JATC demanded $46,906.32 as well as "[a]ny additional costs of this action, additional reasonable attorney's fees, and any other relief as [the] Court deems appropriate."

{¶12} Robinson filed his answer denying the allegations contained in the complaint and raising several affirmative defenses on October 28, 2021. The matter proceeded through discovery, which included taking the depositions of Robinson, as well as Jeffrey Smith, JATC's training coordinator. Thereafter, both parties moved for summary judgment. JATC sought summary judgment on its breach of contract claim, and Robinson sought summary judgment in turn, claiming that the SLA contained an unenforceable penalty clause, an unenforceable non-competition agreement, and that JATC had actually breached the SLA by failing to keep him consistently employed.

{¶13} The trial court ultimately denied JATC's motion for summary judgment and instead granted summary judgment in favor of Robinson on April 13, 2023. It is from that order that JATC now brings its appeal, setting forth four assignments of error for our review.

ASSIGNMENTS OF ERROR

I. THE TRIAL COURT ERRED IN DETERMINING THAT THE RELEVANT PROVISIONS OF THE PARTIES' SCHOLARSHIP LOAN AGREEMENT CONSTITUTE AN UNENFORCEABLE LIQUIDATED DAMAGES PENALTY.

II. THE TRIAL COURT ERRED IN DETERMINING THAT APPELLANT BREACHED THE SCHOLARSHIP LOAN AGREEMENT.

III. THE TRIAL COURT ERRED IN DETERMINING THAT THE PARTIES' SCHOLARSHIP LOAN

AGREEMENT CONTAINED AN UNENFORCEABLE NON-COMPETITION AGREEMENT.

IV.    THE TRIAL COURT ERRED IN DETERMINING THAT APPELLEE ADEQUATELY SET FORTH HIS CLAIMS IN HIS ANSWER TO APPELLANT'S FIRST AMENDED COMPLAINT.

SUMMARY JUDGMENT STANDARD OF REVIEW

{¶14}  Although JATC raises four assignments of error, they all relate to the trial court's grant of summary judgment in favor of Robinson and the denial of its own summary judgment motion.  "We review a trial court's decision on a motion for summary judgment de novo."  *Chilli Associates Limited Partnership v. Denti Restaurants, Inc.*, 2023-Ohio-1978, ¶ 18 (4th Dist.), citing *Harter v. Chillicothe Long-Term Care, Inc.*, 2012-Ohio-2464, ¶ 12 (4th Dist.).  This means that "[w]e afford no deference to the trial court's decision but rather conduct an independent review to determine whether summary judgment is appropriate."  *Id.*  As we explained *Chilli Associates, supra*:

> "A summary judgment is appropriate only when: (1) there is no genuine issue of material fact; (2) reasonable minds can come to but one conclusion when viewing the evidence in favor of the nonmoving party, and that conclusion is adverse to the nonmoving party; and (3) the moving party is entitled to judgment as a matter of law."

*Chilli Associates* at ¶ 18, quoting *Hawk v. Menasha Packaging*, 2008-Ohio-483, ¶ 6 (4th Dist.).

{¶15} "The party moving for summary judgment bears the initial burden to demonstrate that no genuine issues of material fact exist and that they are entitled to judgment in their favor as a matter of law." *DeepRock Disposal Solutions, LLC v. Forté Prods., LLC*, 2021-Ohio-1436, ¶ 68 (4th Dist.). However, "[a] plaintiff * * * moving for summary judgment does not bear the initial burden of addressing the nonmoving party's affirmative defenses." *Todd Dev. Co. v. Morgan*, 2008-Ohio-87, syllabus. " '[I]f the moving party has satisfied its initial burden, the nonmoving party then has a reciprocal burden outlined in Civ.R. 56(E) to set forth specific facts showing that there is a genuine issue for trial and, if the nonmovant does not so respond, summary judgment, if appropriate, shall be entered against the nonmoving party.' " *Vahila v. Hall*, 77 Ohio St.3d 421, 429 (1997), quoting *Dresher v. Burt*, 75 Ohio St.3d 280, 293 (1996).

{¶16} Furthermore, " '[a]ppellate courts apply a de novo standard of review to an appeal from a summary judgment based on the interpretation of a contract.' " *Chilli Assoc.* at ¶ 20, quoting *Lang v. Piersol Outdoor Advertising Co.,* 2018-Ohio-2156, ¶ 16 (4th Dist.). " 'In construing a written instrument, the primary and paramount objective is to ascertain the intent of the parties so as to give effect to that intent.' " *Id.* at ¶ 17, quoting *Shafer v. Newman Ins. Agency*, 2013-Ohio-885, ¶ 10 (4th Dist.). " 'When the terms of a contract are unambiguous, courts will not, in effect, create a new contract by finding an intent not expressed in the clear

language employed by the parties.' " *Id.*, quoting *Waina v. Abdallah*, 2006-Ohio-2090, ¶ 31 (8th Dist.). " ' "If a contract is clear and unambiguous, the court need not go beyond the plain language of the agreement to determine the parties' rights and obligations; instead, the court must give effect to the agreement's express terms." ' " *Id.* at ¶ 18, quoting *Shafer* at ¶ 10, in turn quoting *Uebelacker v. Cincom Sys., Inc.*, 48 Ohio App.3d 268, 271 (1st Dist. 1988). "Courts may not rewrite clear and unambiguous contract provisions to achieve a more equitable result." *Central Allied Ents., Inc. v. Adjutant Gen.'s Dept.*, 2011-Ohio-4920, ¶ 19 (10th Dist.), citing *Dugan & Meyers Constr. Co. v. Ohio Dept. of Adm. Servs.*, 2007-Ohio-1687, ¶ 39.

## ASSIGNMENT OF ERROR IV

{¶17}  Because it is a threshold issue, we address JATC's fourth assignment of error first, and out of order.  In its fourth assignment of error, JATC contends the trial court erred in determining that Robinson adequately set forth his claims in his answer to the first amended complaint.  More specifically, JATC argues that Robinson's three main claims:  1) that the SLA contained an unenforceable liquidated damages clause; 2) that the SLA was breached by JATC; and 3) that the SLA contained an unenforceable non-competition clause, were all affirmative defenses that were not raised in Robinson's answer and were therefore waived.

JATC further argues that affirmative defenses must be set forth with specificity or they are waived.

{¶18} Robinson contends, on the other hand, that his arguments were not only properly before the court, but that JATC has miscast his arguments as affirmative defenses. More specifically, he argues that his claims 1) that JATC cannot show it is entitled to damages, and 2) that JATC did not perform under the contract, are not even affirmative defenses, but rather that they are arguments directly challenging certain elements of a breach of contract claim that JATC was required to prove. He further argues that his claim that the contract was unenforceable because it constituted an unlawful restraint on trade was covered by the affirmative defenses he pled that alleged the SLA was unconscionable. Robinson alternatively argues that even if this Court determines that these were affirmative defenses, they were sufficiently laid out in his answer. Finally, he argues that contrary to JATC's arguments, Civ.R. 8 answers are only subject to notice-pleading standards and moreover, that Civ.R. 8(F) requires that pleadings be construed to do substantial justice.

### Notice-Pleading Requirements Under Civ.R. 8

{¶19} Civ.R. 8(B) states that "[a] party shall state in short and plain terms the party's defenses to each claim asserted and shall admit or deny the averments upon which the adverse party relies." Thus, contrary to JATC's argument, Civ.R.

8 requires a defendant to respond in short and plain terms, not with "specificity."

Civ.R. 8(C) lists the defenses that a defendant must set forth affirmatively as

follows: accord and satisfaction, arbitration and award, assumption of the risk,

contributory negligence, discharge in bankruptcy, duress, estoppel, failure of

consideration, want of consideration for negotiable instrument, fraud, illegality,

injury by fellow servant, laches, license, payment, release, res judicata, statute of

frauds, statute of limitations, and waiver. In addition to these enumerated

defenses, Civ.R. 8(C) provides as follows:

> In pleading to a preceding pleading, a party shall set forth
> affirmatively * * * any other matter constituting an avoidance or
> affirmative defense. When a party has mistakenly designated a
> defense as a counterclaim or a counterclaim as a defense, the
> court, if justice so requires, shall treat the pleading as if there had
> been a proper designation.

Civ.R. 8(F) further states that "[a]ll pleadings shall be construed to do substantial

justice."

Legal Analysis

{¶20} In *Jim's Steak House v. Cleveland*, 81 Ohio St.3d 18 (1998), a case

involving the affirmative defense of res judicata, the Supreme Court of Ohio

considered whether the defense had been preserved at the summary judgment stage

of the proceedings. In that case, the Court observed as follows:

> This case is determined by the rules of pleading. Civ.R.
> 8(B) states that a defendant "shall state in short and plain terms
> the party's defenses to each claim asserted and shall admit or

deny the averments upon which the adverse party relies." In this case, an amended complaint is at issue, but Civ.R. 15(A) requires a similar response to amended pleadings: "A party shall plead in response to an amended pleading within * * * fourteen days after service of the amended pleading * * *."

Civ.R. 8(C) provides that "[i]n pleading to a preceding pleading, a party shall set forth affirmatively * * * res judicata * * *." In *State ex rel. Plain Dealer Publishing Co. v. Cleveland (1996)*, 75 Ohio St.3d 31, 33, 661 N.E.2d 187, 189, this court held that "[a]n affirmative defense is waived under Civ.R. 12(H), unless it is presented by motion before pleading pursuant to Civ.R. 12(B), affirmatively in a responsive pleading under Civ.R. 8(C), or by amendment under Civ.R. 15. *Hoover v. Sumlin* (1984), 12 Ohio St.3d 1, 4, 12 OBR 1, 4, 465 N.E.2d 377, 380." We modify that holding today, noting that Civ.R. 12(H) applies only to affirmative defenses listed in Civ.R. 12(B)(1) through (6). Affirmative defenses other than those listed in Civ.R. 12(B) are waived if not raised in the pleadings or in an amendment to the pleadings. Civ.R. 8; Civ.R. 15.

*Id.* at 20. *See also Johnson v. Waterloo Coal*, 2009-Ohio-5318, ¶ 9 (4th Dist.) (involving a question of whether the affirmative defense of statute of limitations had been waived), citing *Spence v. Liberty Twp. Trustees*, 109 Ohio App.3d 357 (4th Dist. 1996).

{¶21} The Eighth District Court of Appeals has succinctly explained, as follows:

In *SMS Fin. XXVI, L.L.C. v. Waxman Chabad Ctr.*, 2021-Ohio-4174, 180 N.E.3d 730, ¶ 59 (8th Dist.), this court recognized that Civ.R. 8(C) provides a nonexhaustive list of affirmative defenses and Civ.R. 8(E)(1) directs that "[e]ach averment of a pleading shall be simple, concise, and direct." Further, under Civ.R. 8(B), a defendant "shall state in short and plain terms the party's defenses to each claim asserted and shall admit or deny the

averments upon which the adverse party relies." *Jim's Steak House, Inc. v. Cleveland*, 81 Ohio St.3d 18, 688 N.E.2d 506 (1998). Pursuant to the liberal pleading requirements of Civ.R. 8, the pleadings of the parties to an action need only be in general terms. *Thompson Thrift Constr. v. Lynn*, 2017-Ohio-1530, 89 N.E.3d 249, ¶ 87 (5th Dist.), citing *New Lexington City School Dist. Bd. of Edn. v. Muzo Invest. Group*, 5th Dist. Perry No. 15-CA-00012, 2016-Ohio-1338. Further, a defendant's answer is subject to the same notice-pleading standards as a plaintiff's complaint, and an affirmative defense is generally adequate as long as the plaintiff receives fair notice of the defense. *Id*.

*Buckeye Hoya, LLC v. Brown Gibbons Lang & Co.*, *LLC*, 2023-Ohio-2177, ¶ 36 (8th Dist.).

Unlike res judicata that was at issue in *Jim's Steakhouse* and statute of limitations that was at issue in *Johnson*, Civ.R. 8(C) does not expressly list the presence of an unenforceable liquidated damages clause, prior breach by the plaintiff, nor the presence of an unenforceable non-competition clause as affirmative defenses. JATC nevertheless contends, however, that the liquidated damages claim, as well as the claim that JATC breached the contract first, were defenses that were required to be raised affirmatively because they were matters that constituted an "avoidance," as set forth in Civ.R. 8(C).

{¶22} In *Shamrock v. Cobra Resources, LLC*, 2022-Ohio-1998, ¶ 91 (11th Dist.), it is explained that "an affirmative defense [is] one that 'assumes establishment of a prima facie case.' " Quoting *Gallagher v. Cleveland Browns Football Co. v. Cleveland*, 75 Ohio St.3d 427, 432, fn. 3 (1996). "In other words, '

"an affirmative defense is any defensive matter in the nature of a confession and avoidance." ' " *Shamrock* at ¶ 91, quoting *Plain Dealer* at 33, in turn quoting 1 Klein, Browne & Murtaugh, Baldwins Ohio Civil Practice, Section 13.03 (1988). "It admits that the plaintiff has a claim (the 'confession') but asserts some legal reason why the plaintiff cannot have any recovery on that claim (the 'avoidance')." *Id.* As further explained in *Shamrock*, "[b]y contrast, a defense that directly attacks an element of a prima facie case rather than accepting the allegations of the complaint as true is not affirmative defense." *Shamrock* at ¶ 91, citing *Gallagher* at 432, fn. 3. As noted above, Robinson argues that his liquidated damages and prior breach claims are direct attacks on the second and fourth elements of JATC's breach of contract claim and therefore are not affirmative defenses. While we certainly can understand the rationale behind Robinson's arguments, there are several cases, although not binding upon us, which persuasively state otherwise.

{¶23} " ' " 'In order to succeed on a breach of contract claim, a party must prove the existence of a contract, *the party's performance under the contract*, the opposing party's breach, and resulting damage.' " ' " (Emphasis added). *Lawless v. Board of Education*, 2020-Ohio-117, ¶ 54 (4th Dist.), quoting *S.P. Drilling Services, Inc. v. Cooper's Excavating LLC*, 2019-Ohio-55, ¶ 15 (4th Dist.), quoting *Martin v. Jones*, 2015-Ohio-3168, ¶ 36 (4th Dist.), in turn quoting *DePompei v. Santabarbara*, 2015-Ohio-18, ¶ 20 (8th Dist.). " ' "Where a plaintiff seeks to

recover damages for breach of contract, the burden is upon [the plaintiff] to show either substantial performance or tender of performance of the conditions on [the plaintiff's] part to be performed." ' " *Lawless* at ¶ 54, quoting *Cashland Fin. Servs., Inc. v. Hoyt*, 2013-Ohio-3663, ¶ 8 (9th Dist.), in turn quoting *Thomas v. Matthews*, 94 Ohio St. 32 (1916), syllabus.

{¶24} Here, JATC filed its amended complaint claiming a breach of contract on October 19, 2021. Although Robinson filed his answer on October 28, 2021, denying that the SLA constituted "a valid and written binding contract," his answer denied that JATC had "at all times performed its obligations under the" SLA and also denied that JATC had been damaged in the amount it claimed. Robinson's answer also contained several "Affirmative Defenses," as follows:

> 1. Plaintiff has failed to state a claim upon which relief can be granted.
>
> 2. Plaintiff's contract with Defendant was unconscionable as to its terms.
>
> 3. Plaintiff's contract with Defendant was unconscionable as to the bargaining power between the two parties.
>
> 4. Plaintiff's prayer for relief should be denied by Defendant's defense of promissory estoppel because Defendant reasonably relied on Plaintiff's promises to be employed by Plaintiff but Defendant was laid off a frequent number of times.
>
> 5. Plaintiff's demand for relief should be denied due to Plaintiff being unjustly enriched by means of their demand.

6.    Plaintiff's demand for relief should be denied because Plaintiff is acting unethically and acted in bad faith pursuant to the unclean hands doctrine.

7.    Defendant reserves the right to raise other affirmative defenses.

{¶25}  As argued by JATC, the Tenth District Court of Appeals has held that "[a] party seeking to invalidate a purported liquidated-damages clause is asserting an affirmative defense and bears the burden of proof establishing that the clause generates damages in the form of a penalty, rather than reasonably apportioned damages." *CosmetiCredit, L.L.C. v. World Fin. Network Natl. Bank*, 2014-Ohio-5301, ¶ 48 (10th Dist.), citing *MatchMaker Internatl., Inc. v. Long*, 100 Ohio App.3d 406, 408 (9th Dist. 1995) and *Dykeman v. Johnson*, 83 Ohio St. 126, 135 (1910).  The Second and Eighth Districts have held the same.  *See RLM Properties, Ltd. v. Brammer*, 2014-Ohio-3509, ¶ 21 (2d Dist.) (" 'That a provision for liquidated damages constitutes a penalty rather than a valid liquidated damages provision is an affirmative defense' "), quoting *UAP-Columbus JV326132 v. O. Valeria Stores, Inc.*, 2008-Ohio-588, ¶ 12 (10th Dist.).  *See also Arrow Uniform Rental, Inc. v. Nix*, 2002-Ohio-5855, ¶ 15 (8th Dist.) (the failure to raise the defense of penalty as an affirmative defense in any responsive pleading or at a default judgment hearing results in the defense being waived).  Thus, in light of the foregoing, although Robinson's claim that the purported liquidated damages clause in the SLA constituted a penalty does technically attack an element of JATC's

breach of contract claim, there is established caselaw which we find persuasive that nevertheless holds that this claim is an affirmative defense.

{¶26} The same is true for Robinson's claim that JATC actually breached the SLA by failing to keep him consistently employed. *See City of Oberlin v. Lorain County Joint Vocational School. Dist. Bd. of Educ.*, 2019-Ohio-3977, ¶ 24 (9th Dist.) (finding that a claim of anticipatory breach of contract "is in the nature of confession and avoidance, and, therefore, an affirmative defense"), citing *Plain Dealer, supra,* at 33; *Premium Enterprises, Inc. v. T.S., Inc.*, 1999 WL 61488, *2 (9th Dist. Feb. 9, 1999) (finding that because the defendant "argued that plaintiff breached the contract first, forcing it to breach * * * [the] [d]efendant was, therefore relying on the affirmative defense of anticipatory repudiation"). *See also Universal Steel Buildings Corp. v. Dues*, 2024-Ohio-698, ¶ 132 (3d Dist.) ("The defense of 'prior material breach' is an affirmative defense to a contract claim"). Finally, we likewise conclude that Robinson's claim that the SLA contained an unenforceable non-competition agreement is a defense in the nature of confession and avoidance that was also required to be set forth affirmatively. Thus, we find all of these arguments constituted affirmative defenses that were required to be raised in Robinson's answer.

{¶27} However, upon close review and in light of the liberal pleading requirements of Civ.R. 8(C), we find merit to Robinson's argument that the

language employed in his affirmative defenses section of his answer placed JATC on fair notice of his claims. Specifically, we conclude that Robinson's second and third affirmative defenses which claimed the SLA was unconscionable as to its terms and as to the bargaining power between the parties put JATC on notice of Robinson's claims that the SLA contained an unenforceable liquidated damages provision and an unenforceable non-competition agreement. As argued by Robinson, the determination that a provision in a contract is unconscionable renders it unenforceable. Further, as explained in *Universal Steel Buildings Corp. v. Dues, supra*, at ¶ 129, " '[i]f a party raises a "generic" defense in its answer, it is acceptable to make fair interpolations of more specific defenses that might naturally be included in that defense.' " Quoting *Reed v. Multi-Cty. Juvenile Sys.*, 2010-Ohio-6602, ¶ 42 (7th Dist.).

{¶28} We likewise conclude that Robinson's fourth affirmative defense, which stated that "Plaintiff's prayer for relief should be denied by Defendant's defense of promissory estoppel because Defendant reasonably relied on Plaintiff's promises to be employed by Plaintiff but Defendant was laid off a frequent number of times[,]" gave JATC fair notice of his claim that JATC's own breach caused Robinson's breach. JATC argues that promissory estoppel is not a defense at all, but rather is an equitable doctrine that may be asserted as a separate cause of action based upon induced reliance. However, despite the wording or use of the term

promissory estoppel, we conclude it is clear that Robinson was defending on the basis that JATC had failed to perform under the contract, or in other words, breached the contract first, thereby excusing Robinson's own performance under the contract. Further, Civ.R. 8(C) specifically provides that "[w]hen a party has mistakenly designated a defense as a counterclaim or a counterclaim as a defense, the court, if justice so requires, shall treat the pleading as if there had been a proper designation." Moreover, the Seventh District Court of Appeals has stated that "Civ.R. 8(F) states that the pleadings of the parties are to be 'construed as to do substantial justice,' which further supports the notion that pleadings should be construed in order to dispose of cases on their merits rather than technicalities." *Reed, supra, at* ¶ 41. *See also Universal Steel Buildings Corp., supra*, at ¶ 129.

{¶29} Thus, in light of the foregoing and in the interests of justice, we cannot conclude that the trial court erred in determining that Robinson adequately set forth his claims in his answer to JATC's first amended complaint. Having found no merit in what we considered to be a threshold issue, Local 168's fourth assignment of error is overruled and we now move on to consider its remaining assignments of error.

ASSIGNMENT OF ERROR II

{¶30} We next address JATC's second assignment of error. In its second assignment of error, JATC contends that the trial court erred in determining that it

breached the scholarship loan agreement.  It argues that although it "uses its best efforts to provide continuous employment" for the apprentices, it plays no active role in the hiring of apprentices.  Robinson responds by arguing that the trial court correctly held that JATC's "failure to provide consistent employment and on-the-job training to Robinson precluded it from recovering under the SLA."  More specifically, Robinson argues that JATC's breach of contract claim failed because it failed to prove its own performance under the contract.

{¶31} Robinson further argues that the provision of training by JATC to Robinson to become a pipefitter was a material term of the SLA and that JATC did not provide the "training" contemplated by the SLA.  In particular, Robinson contends that he was not receiving training to become a pipefitter during his apprenticeship while he was working for Pioneer Pipe.  He also argues that although he was receiving "OJT experience" while working for Grae-Con, that experience was in "fits and starts, as he was laid off three times in less than 10 months."  He contends that although he was in the apprenticeship program for over 20 months (from September 2019 until May 2021), he only received "actual pipefitting training for a fraction of that time."  Thus, Robinson argues that JATC's failure to substantially perform constituted a material breach because the failure to provide training "destroyed the purpose of the SLA."

{¶32} Additionally, in response to this assignment of error, Robinson claims that he did not breach the terms of the SLA by accepting employment with Surgent because JATC breached the SLA first by failing to provide him with the training and employment contemplated by the SLA. Thus, Robinson essentially argues that he was legally excused from performing under the SLA and therefore his acceptance of employment with Surgent did not constitute a breach.

Contract Principles

{¶33} In *Bradley v. Pentajay Homes, Div. of C&E Stores, Inc.*, 1991 WL 122853, *6 (4th Dist. July 3, 1991), this Court generally observed as follows regarding a claim for breach of contract:

> A breach of contract is a failure without legal excuse to perform any promise which forms a whole or part of a contract, including the refusal of a party to recognize the existence of the contract or the doing of something inconsistent with its existence.

Citing *National City Bank of Cleveland v. Erskine & Sons*, 158 Ohio St. 450 (1953), paragraph one of the syllabus.

As set forth above, " ' " '[i]n order to succeed on a breach of contract claim, a party must prove the existence of a contract, the party's performance under the contract, the opposing party's breach, and resulting damage.' " ' " (Emphasis added.) *Lawless v. Bd. of Educ. of Lawrence Cty. Educ. Svc. Ctr., supra*, at ¶ 54, quoting *S.P. Drilling Services, Inc. v. Cooper's Excavating LLC, supra*, at ¶ 15,

quoting *Martin v. Jones, supra*, at ¶ 36, in turn quoting *DePompei v. Santabarbara, supra*, at ¶ 20.

{¶34} " ' "Where a plaintiff seeks to recover damages for breach of contract, the burden is upon [the plaintiff] to show either substantial performance or tender of performance of the conditions on [the plaintiff's] part to be performed." ' " *Lawless* at ¶ 54, quoting *Cashland Fin. Servs., Inc. v. Hoyt, supra*, at ¶ 8, in turn quoting *Thomas v. Matthews*, *supra*, at syllabus. " ' "In the law of contracts, 'substantial performance' is [an] approximation of full performance such that the parties obtain, in the main, what the contract called for, although it is not complete and final performance in every particular." ' " (Alteration sic.) *Lawless* at ¶ 54, quoting *Fifth Third Bank v. Ducru Ltd. Partnership*, 2006-Ohio-3944, ¶ 17 (1st Dist.), in turn quoting *Stone Excavating, Inc. v. Newmark Homes, Inc.*, 2004-Ohio-4119, ¶ 13 (2d Dist.), citing 17A American Jurisprudence 2d. 576, Contracts, Section 619. As noted in *Lawless*, " '[a] party is in substantial compliance with its promises when its deviations are nominal, trifling, technical, slight, and consistent with an honest effort to perform.' " *Lawless* at ¶ 54, quoting *Fifth Third* at ¶ 18. " 'For the doctrine of substantial performance to apply, the unperformed duties must not destroy the value or purpose of the contract.' " *Id.* Further, "[i]f the 'facts are undisputed, whether a party's conduct constitutes substantial performance is a question of law for the court.' " *Id.*

{¶35} In *Universal Steel Buildings Corp., supra*, at ¶ 125, the court explained that " '[a] material breach is a breach essential to the purpose of the contract.' " Quoting *Whitt Sturtevant v. NC Plaza*, 2015-Ohio-3976, ¶ 30 (10th Dist.). "To constitute a material breach of contract, the breach must be 'a failure to do something that is so fundamental to a contract that the failure to perform defeats the essential purpose of the contract or makes it impossible for the other party to perform.' " *Universal Steel Building Corp.* at ¶ 125, quoting *Marion Family YMCA v. Hensel*, 2008-Ohio-4413, ¶ 7 (3d Dist.). The court further observed that " '[t]he determination of whether a party's breach of contract was a "material breach" is *generally* a question of fact.' " (Emphasis added). *Universal Steel Building Corp.* at ¶ 125, quoting *Whitt Sturtevant* at ¶ 30, in turn quoting *O'Brien v. Ohio State Univ.*, 2007-Ohio-4833, ¶ 11 (10th Dist.).

{¶36} This Court has also observed as follows with respect to the question of whether a material breach may be resolved through summary judgment:

> In order to determine if an alleged breach was material, the factfinder must consider all of the circumstances of the particular case, including the conduct and relationship of the parties. [*Unifirst Corp. v. M. & J. Welding & Mach., Inc.*, 4th Dist. Scioto No. 95CA2401, 1996 WL 547948]. *Todd v. Heekin* (S.D.Ohio 1982), 95 F.R.D. 184, 186; 2 Restatement of the Law 2d, Contracts (1981) 237, Section 241. *See, also, Cent. Trust Co., N.A. v. Fleet Natl. Bank*, 1st Dist. Hamilton No. C930162, 1994 WL 176912. Furthermore, as noted in *Sahadi v. Continental Illinois Natl. Bank and Trust Co.* (C.A.71983), 706 F.2d 193, 196-197, the determination of materiality is often a complicated question of fact that must be resolved with reference to the

> parties' intentions as evidence[d] by the circumstances of the transaction. *Unifirst, supra. See, also, Wagner v. Flo-lizer Inc.*, 4th Dist. Pike No. 407, 1998 WL 38848. As such, the issue of materiality is normally inappropriate for resolution through summary judgment. *Unifirst, supra; Sahadi, supra*, at 197. Mere nominal, trifling, or technical departures will not result in a breach of contract; slight departures, omissions and inadvertencies should be disregarded. *Tucker v. Young*, 4th Dist. Highland No. 04CA10, 2006-Ohio-1126, 2006 WL 574309, ¶ 25; *Fitzpatrick v. Yeauger*, 4th Dist. Lawrence No. 97CA35, 1998 WL 379329, at *4; *Cleveland Neighborhood Health Serv., Inc., v. St. Clair Builders, Inc.*, 64 Ohio App.3d 639, 582 N.E.2d 640 (8th Dist.1989) citing *Ashley v. Henahan*, 56 Ohio St. 559, 47 N.E. 573(1897).

*Watershed Mgt. v. Neff*, 2014-Ohio-3631, ¶ 31 (4th Dist.)

However, as recently noted by the Tenth District Court of Appeals, a party may prevail on a motion for summary judgment for a breach of contract claim if he or she is able to "prove that no genuine issue of material fact exists as to the existence of a contract, performance by the plaintiff, breach by the defendant, and damage or loss to the plaintiff." *Truist Bank v. Eichenberger*, 2023-Ohio-779, ¶ 38 (10th Dist.), citing *Jarupan v. Hanna*, 2007-Ohio-5081, ¶ 18 (10th Dist.).

Legal Analysis

{¶37} In its first amended complaint, JATC alleged that it had "at all times performed its obligations under the contract." Robinson alleged in his answer that JATC's "prayer for relief should be denied by Defendant's defense of promissory estoppel because Defendant reasonably relied on Plaintiff's promises to be employed by Plaintiff but Defendant was laid off a frequent number of times." In

his motion for summary judgment filed below, Robinson argued that "[t]he JATC breached the SLA before any alleged breach by Robinson."  Robinson's motion further argued that "training" was the "entire point" of the SLA and thus, was a material term.  Robinson contended that JATC "did not provide [him] with the 'training' contemplated by the SLA and thus materially breached it."  Thus, Robinson essentially argued that JATC's material breach of the SLA excused his own performance under the contract.

{¶38} Robinson's summary judgment argument alleging a breach by JATC was primarily based upon his contention that he was not actually receiving "training" to become a pipefitter during the time he was employed with Pioneer Pipe, as well as the fact that he was laid off several times while working for Grae-Con.  When asked during his deposition whether he received "any on-the-job credits while working for Pioneer Pipe," Robinson stated that he did not.  He further argued in his motion for summary judgment that he did not actually "receive an OJT experience that had him performing pipefitting tasks" until he went to work for Grae-Con.  Robinson pointed out, however, that he was laid off three times in ten months at Grae-Con and that he didn't receive any other "realistic" OJT opportunities the remainder of his time in the program after working for Grae-Con.  He contended that although he was in the apprenticeship

program "for over one year and 8 months (from September 2019 until May 2021)" that he "received actual pipefitting training for only a fraction of that time."

{¶39} In its brief in opposition to Robinson's motion for summary judgment, JATC argued that it had not breached the SLA, but rather that it had substantially performed under the terms of the SLA. JATC argued 1) that apprentices are not employees of apprenticeship programs; 2) that apprentices receive OJT "solely through dispatch via the hiring hall of Local Union No. 168"; and 3) that apprentices "must wait for a call from the Union's business agent to advise them of any such opportunities." As noted above, JATC contended that it played no active role in hiring and that such a structure is essentially customary in the industry. This argument is supported by the deposition testimony of Jeff Smith, the JATC training coordinator.

{¶40} JATC further argued in its opposition brief that it had "provided its best efforts to ensure that OJT was available for [Robinson]." JATC argued that while working at Pioneer Pipe, Robinson was a "jack of all trades" and, contrary to Robinson's argument, that OJT credit was awarded to Robinson for the work done at Pioneer Pipe. This argument is supported by Smith's deposition transcript. JATC also contended that during his time in the program, in total, Robinson "received no less than 3,114 OJT credit hours" and was "classified as a third-year apprentice * * * even though he had only spent two years as a registered

apprentice." JATC admits that although work "may ultimately have been slow after [Robinson] was laid off from Grae-Con * * * [s]uch a reality cannot simply be imputed on Plaintiff as a breach of its obligations under the SLA." JATC further argued that "any purported deviations from [its] contractual promises [were] immaterial, at most."

{¶41} In its decision granting summary judgment in favor of Robinson, the trial court found "that JATC's failure to provide consistent employment and on-the-job training to Robinson means that it breached the SLA before Robinson's alleged breach in April 2021." The trial court further found that "JATC's breach forced Robinson into taking a non-union job." In reaching its decision, the trial court relied on information contained in the Apprentice Handbook, as well as the Standards of Apprenticeship that govern JATC's apprenticeship program.

{¶42} In particular, the trial court noted that the Standards stated that the "sponsor [i.e. the JATC] intends and expects to give each apprentice continuous employment and will use its best efforts to keep the apprentice employed during the full term of apprenticeship." The trial court further noted that the program requires that apprentices "amass a total of 8,500 hours of OJT to complete the Program." The trial court stated that there were no "realistic" OJT opportunities that were provided to Robinson after his layoff from Grae-Con, explaining that the one position that was offered was not viable for numerous reasons, including the

fact that the position was two hours away from the instructional center, would have required lengthy daily drives or even overnight stays, and would have caused Robinson to miss his RTI classes. However, the trial court also stated that although the program required the apprentices to complete 1,230 RTI hours, an apprentice pipefitter's RTI requirements may be suspended "if work travel prohibits the apprentice from attending RTI classes[.]"

{¶43} Based upon the following information contained in the record before us, we conclude the trial court erred in granting summary judgment in favor of Robinson on his claim that JATC breached the terms of the SLA by failing to provide him with consistent employment. First, and importantly, although Robinson claims that he did not receive OJT credit for the time he worked at Pioneer Pipe, the record demonstrates otherwise. Jeff Smith, the training coordinator for JATC, testified in his deposition that not only was Robinson awarded OJT credit for his time at Pioneer Pipe, but that at the point in time when Robinson was laid off for the last time by Grae-Con, he had accumulated 3,114 OJT hours and was considered a third-year apprentice despite only being in his second year of the program.

{¶44} Furthermore, although Robinson cites the fact that he was laid off by Grae-Con three times in less than ten months and had been unemployed for two months at the time he accepted employment with Surgent, the record demonstrates

that Robinson was never laid off for any extended periods of time. For instance, in his deposition, Jeff Smith testified that Robinson was employed by Grae-Con from May 11, 2020 until June 23, 2020, and then again from July 13, 2020 until December 3, 2020, and then again from January 4, 2021 until February 23, 2021. Thus, the first time he was laid off was only for 19 days. The second time he was laid off for 32 days. Finally, when he was laid off on February 23, 2021, he was not called back to work by Grae-Con. However, he was then offered a job with Southfield Energy powerhouse on March 24, 2021, located in Wellsville, Ohio, which he refused. As such, at the time he was offered employment with Southfield, he had only been laid off from Grae-Con for 28 days.

{¶45} The Southfield job, although two hours away, would have provided him with 58 hours per week of work, would have provided OJT credit, and JATC would have suspended his RTI requirement while he was assigned to that job, which was expected to last one to three months. Understandably, Robinson did not want to travel that far daily or incur the cost of hotel stays; however, his refusal to accept that offer of employment is what led to him being unemployed for an additional month prior to accepting employment with Surgent. We cannot conclude that the layoffs noted above defeated the essential purpose of the SLA. Therefore, we cannot find that the facts before us demonstrate a material breach on JATC's part.

{¶46} Instead, we conclude it shows that JATC ensured Robinson had received 3,114 hours of the required 8,500 of OJT by near the end of his second year as an apprentice, which by all accounts demonstrates Robinson was on track and progressing as required through the program. We further conclude that although the Southfield job may not have been ideal, JATC would have worked with Robinson to make up any missed RTI instruction and importantly, Robinson would have been provided with employment well above 40 hours per week had he accepted the position. His refusal of that employment does not translate to a breach, or failure to perform, on JATC's part.

{¶47} In light of the foregoing, we conclude that the record shows that JATC defended against Robinson's claim of breach by establishing that it had substantially performed with the terms of the SLA. Although Robinson claims he did not receive pipefitter experience while working for Pioneer Pipe, JATC did award Robinson OJT for his time working there. This Court cannot second guess the training committee's decisions with respect to whether certain work qualifies or doesn't qualify for OJT in a skilled trade. However, the record is clear that credit was awarded. Further, we conclude that the layoffs for the minimal amounts of time set forth above do not rise to the level of a material breach, but instead demonstrate substantial performance on JATC's part. Although the Southfield job would have necessitated travel, it is certainly not unheard of for union workers to

have to travel for certain jobs.  Here, the job was only scheduled to last one to three months and JATC would have permitted Robinson time to make up his missed RTI.  Thus, we conclude as a matter of law that JATC substantially performed under the SLA and, as a result, the trial court erred in granting summary judgment in favor of Robinson on the question of whether JATC breached the terms of the SLA.  Accordingly, JATC's second assignment of error is sustained.

## ASSIGNMENT OF ERROR III

{¶48} We next address JATC's third assignment of error.  In its third assignment of error, JATC contends the trial court erred in determining that the SLA  contained an unenforceable non-competition agreement.  More specifically, JATC argues that "[r]estrictive covenant analysis does not apply to contracts that are not between an employer and employee."  JATC argues that the SLA's provisions are enforceable and that Robinson breached the SLA by accepting work for a non-contributing employer.

{¶49} Robinson responds by contending that the clause at issue in the SLA constitutes a non-competition agreement that is unenforceable because it is an unlawful restraint on trade.  The trial court held that the provision of the SLA prohibiting Robinson from working for certain employers unless he pays the amount of the scholarship loan was actually a non-competition agreement which was unenforceable, finding that the provision was "overly broad as to location and

work that Robinson could perform" and further, that the provision was "unenforceable as an unlawful restraint on trade." The trial court also found that "the job Robinson took does not involve pipe-fitting and is outside the geographical jurisdiction of Local 168." Thus, it appears that the trial court found no breach on Robinson's part, even stating that JATC "breached the SLA before Robinson's *alleged breach*."

### Repayment Provisions of the Scholarship Loan Agreement

{¶50} As set forth above, the SLA prohibits an apprentice from "seeking or accepting" employment from any employer that is engaged in "any general, mechanical, plumbing or pipefitting work or any other work covered by the Constitution of the United Association of Journeymen and Apprentices of the Plumbing and Pipefitting Industry of the United States and Canada, AFL-CIO" unless such employment was performed in accordance with "the terms of a UA local union collective bargaining agreement that provides for the payment of contributions by such employer to the JATC or another UA Joint Apprenticeship and Training Committee." This restriction upon employment purports to apply while any amount is still outstanding on the SLA. The SLA further provides that an apprentice's acceptance of employment in the "Plumbing and Pipefitting Industry" from any employer who does not have a collective bargaining agreement

with a UA local union providing for the payment of contributions to the JATC or another JATC constitutes an "immediate breach" of the agreement.

{¶51} The SLA provides that should an apprentice breach the agreement during the one-year probationary period, "the Apprentice will be liable for any costs incurred by the JATC for the training received by the Apprentice during the probationary period." However, "[o]nce the Apprentice completes the probationary period * * * all amounts due and owing on the Scholarship Loan, reduced by any credit received by the Apprentice pursuant to Paragraph 6 hereof, or by cash payments made, will become immediately due and payable * * *."[3] The SLA defines the Plumbing and Pipefitting Industry as "any and all types of work covered by any of the collective bargaining agreements to which the United Association of Journeymen and Apprentices of the Plumbing and Pipefitting Industry of the United States and Canada, AFL-CIO * * * and/or any affiliated Local Union are a party or under the trade jurisdiction of the United Association's Constitution; *or in any related building or construction trade*." (Emphasis added).

Non-competition Agreements

{¶52} The Supreme Court of Ohio has explained as follows, in general, regarding covenants not to compete, or non-competition agreements:

---

[3] Paragraph 6 is entitled "Repayment by In-Kind Credits" and provides a structure whereby apprentices can essentially work off their loan balance by working under a "UA collective bargaining agreement a minimum of five (5) calendar years at a minimum of fifteen hundred (1500) hours" in qualifying employment. Importantly, the employment must be for an employer who makes contributions to the JATC or another JATC.

Generally, courts look upon noncompetition agreements with some skepticism and have cautiously considered and carefully scrutinized them. Ingram, Covenants Not to Compete (2002), 36 Akron L.Rev. 49, 50. Under English common law, agreements in restraint of trade, including noncompetition agreements, were disfavored as being against public policy, although partial restraints supported by fair consideration were upheld. *Lange v. Werk* (1853), 2 Ohio St. 519, 527-528, 1853 WL 117, citing *Mitchel v. Reynolds* (1711), 1 P. Wms. 181, 24 Eng.Rep. 347. In a society in which working men entered skilled trades only by serving apprenticeships, and mobility was minimal, restrictive covenants precluding an ex-employee from competing with his ex-employer "either destroyed a man's means of livelihood, or bound him to his master for life." *Raimonde v. Van Vlerah* (1975), 42 Ohio St.2d 21, 71 O.O.2d 12, 325 N.E.2d 544.

Modern economic realities, however, do not justify a strict prohibition of noncompetition agreements between employer and employee in an at-will relationship. "The law upholds these agreements because they allow the parties to work together to expand output and competition. If one party can trust the other with confidential information and secrets, then both parties are better positioned to compete with the rest of the world. * * * By protecting ancillary covenants not to compete, even after an employee has launched his own firm, the law 'makes it easier for people to cooperate productively in the first place.' " *KW Plastics v. United States Can Co.* (Feb. 2, 2001), M.D. Ala. Nos. Civ. A. 99-D-28-N and 99-D-878-N, 2001 WL 135722, quoting *Polk Bros., Inc. v. Forest City Ent., Inc.* (C.A.7, 1985), 776 F.2d 185, 189.

Accordingly, this court has long recognized the validity of agreements that restrict competition by an ex-employee if they contain reasonable geographical and temporal restrictions. *Briggs v. Butler* (1942), 140 Ohio St. 499, 507, 24 O.O. 523, 45 N.E.2d 757. Such an agreement does not violate public policy, "being reasonably necessary for the protection of the employer's business, and not unreasonably restrictive upon the rights of the employee." *Id*. at 508, 24 O.O. 523, 45 N.E.2d 757.

*Lake Land Emp. Group of Akron, LLC v. Columber*, 2004-Ohio-786, ¶ 7-9.

{¶53} In *Lake Land*, the Court further reaffirmed its prior holding in

*Raimonde*, as follows:

> "1. A covenant not to compete which imposes unreasonable restrictions upon an employee will be enforced to the extent necessary to protect an employer's legitimate interests.  * * *

> "2. A covenant restraining an employee from competing with his former employer upon termination of employment is reasonable if the restraint is no greater than is required for the protection of the employer, does not impose undue hardship on the employee, and is not injurious to the public."  42 Ohio St.2d 21, 71 O.O.2d 12, 325 N.E.2d 544.

*Id.* at ¶ 23-24, quoting *Raimonde* at paragraphs one and two of syllabus.

Legal Analysis

{¶54} As set forth above, JATC contends that "[r]estrictive covenant analysis does not apply to contracts that are not between an employer and employee."  JATC further contends that its relationship with Robinson did not constitute an employer-employee relationship.  Robinson contends that JATC's argument that a non-competition analysis is misplaced because JATC was not his "direct employer" "ignores the JATC's unique structure."  In support of his argument, Robinson references the fact that "the JATC is jointly operated by members of the Local 168 and the Piping Contractors of Marietta, Ohio."

{¶55} The *Lake Land* case mentioned above involved a non-competition agreement that was executed between an employer and an employee and we agree

that both *Lake Land* and *Raimonde's* explanations regarding non-competition agreements reference employer-employee relationships. *Id.* at ¶ 1. JATC cites several Ohio cases in further support of its position that non-competition agreements are restricted to employer-employee relationships. *See Terminal Vegetable Co. v. Beck*, 8 Ohio App.2d 231, 233 (8th Dist. 1964) (in a case involving a lawsuit stemming from the sale of a business, the court stated "[i]t was not an employment contract. We are not, therefore, concerned with the law dealing with restrictive covenants as a part of employment agreements"); *LCD Videography, L.L.C. v. Finomore*, 2010-Ohio-6571, ¶ 72 (11th Dist.) (upholding the trial court's determination that individuals were employees, as opposed to independent contractors, for purposes of enforcing non-competition agreement between the parties). Additionally, in *Holzer Clinic, Inc. v. Simpson*, 1998 WL 241887 (4th Dist. Apr. 18, 1998), this Court considered the enforceability of a non-competition agreement in the context of an employer-employee relationship.

{¶56} Additionally, and importantly, JATC cites a federal case involving another apprenticeship program which held that the relationship between an apprentice and a training committee is not that of an employer and employee and, essentially, that it does not lend itself to an analysis of whether a non-competition agreement is enforceable in such a context. For example, *Milwaukee Area Joint Apprenticeship Training Committee for the Elec. Indus. v. Howell*, 67 F.3d 1333,

1336 (7th Cir.1995) involved an apprenticeship program structured very similarly

to the one presently before us that included a scholarship loan agreement providing

that:

> * * * [I]f the apprentice chooses to accept employment within
> the electrical industry, he has two options: (1) repay the cost of
> his training in kind by working for an employer who contributes
> either to the Trust Fund or to a like trust fund, or (2) default under
> the terms of the agreement by working for an employer who does
> not contribute to either the Trust Fund or a like trust fund, and
> repay the cost of his training in cash.

Howell argued that the repayment provision of the scholarship loan agreement

violated Wisconsin's laws governing restrictive covenants in employment

contracts. *Id.* at 1339.

> {¶57} However, the court rejected Howell's argument, reasoning as follows:

> A restrictive covenant is a covenant that is typically
> included in an employment contract to govern an employee's
> conduct upon the termination of his employment relationship.
> Such a covenant is "intended to prevent a former employee from
> competitively using information or contacts gained as a result of
> the employee's association with the employer." *State Arms Gun
> Co., Inc. v. Schmelling*, 196 Wis.2d 371, 539 N.W.2d 135
> (Wis.App.1995). Howell's obligation, on the other hand, is not
> such a covenant; it does not prevent him from working for a
> competing employer, from working within a certain industry, or
> from working within a geographic area. It is simply an obligation
> to repay the cost of his training.

*Id.*

The court further reasoned as follows:

> Presumably the trustees could have modeled the SLP after standard collegiate and post-graduate school loans by requiring Howell's training costs to be repaid in cash, regardless of his employment situation. However, the trustees chose to provide Howell with an in kind repayment opportunity. The choice of whether to repay the loan in cash or in kind was completely within his discretion. In this respect, there is little difference between Howell's obligation and the compulsory public service requirements attached to some government-financed loan programs, which have consistently been held to be enforceable.

*Id.  See also Stair v. Lehigh Valley Carpenters Local Union No. 600 of United Broth. of Carpenters*, 1993 WL 235491, *4, (E.D.Pa. July 24, 1993), aff'd. 43 F.3d 1463, (3d Cir. 1994) (explaining that, in a training program much like the one sub judice, the apprentices are not employees and the training fund is not an employer, but rather the fund is obligated to use its best efforts to keep each apprentice continually employed).

{¶58} Additionally, in *National Training Fund for Sheet Metal and Air Conditioning Industry  v. Maddux*, 751 F.Supp. 120 (S.D.Texas 1990), the court considered an argument that it was against public policy to require an apprentice to either work for a company that paid for his education, or to repay the cost of his training himself.  The court referred to this type of contractual provision as a "work-or-pay provision," rather than a non-competition clause.  *Id.* at 122.  In considering the argument, the court reasoned as follows:

The spectre of a contract against public policy does not fit the facts, but the enforcement of these contracts does implicate an important public interest. Without contracts to structure the economic benefits, society would be less productive because neither the unions nor employers would risk investing the addition of skills to employees who were not required to earn part of their training cost back by working for the unions and companies. In the absence of a lawful method to prevent the worker and competing contractors from obtaining a free ride, the Funds and related employers would simply not train workers leaving everyone the loser.

As an analogy, when a worker leaves he cannot take his uniform and tools to his employer's competitor, but skill, once bestowed on a worker is unrecoverable and transportable. Reimbursement by a beneficiary, if bargained for fairly, only places the parties somewhere near their starting points. *See United States v. Barry*, 904 F.2d 29 (11th Cir.1990) (A doctor whose schooling was paid by the American taxpayers was obliged to repay the loan or to serve those who educated him for four years in a public health program, as he agreed).

*Maddux* at 121.

{¶59} *Maddux* also explains the importance of upholding the general framework that exists for educating and training skilled workers in the various trades, as follows:

These national training Funds are not charities, giving away their resources. The Funds train a limited number of people who will directly benefit the members. The purpose of the contract is not to enslave the employees. The reimbursement prevents freeloading by neighboring competitors. Because they do not pay for the program, they can pay workers slightly more than the members can at the same total cost. The public is best served by enforcement of a reasonable reimbursement provision.

> Without a check on freeloading by non-participating companies, the Funds would not have trained Maddux. The work-or-pay provision is what allowed Maddux to acquire his new skill. The reimbursement makes a non-participating employer equal to a participating employer if he pays the reimbursement, either in the form of a lump sum or a higher salary to get the trained worker.

*Maddux* at 121-122.

{¶60} We find both *Howell* and *Maddux* to be very persuasive and applicable to the facts presently before us. In particular, we find that the apprenticeship program at issue here was sufficiently similar to the ones involved in both *Howell* and *Maddux* and that the reasoning set forth in those cases can be logically extended to apply to the issues presently before us. As such, we cannot conclude the relationship between the parties here constituted an employer-employee relationship or that the repayment provision at issue here constituted a non-competition agreement. Instead, the provision at issue here can also be characterized as a work-or-pay provision that allows JATC to recoup its cost in providing education and training to its apprentices, whether they breach the terms of their apprenticeship or whether they complete their apprenticeship. Thus, the repayment provision at issue in the present case is not a non-competition agreement and the trial court erred in granting Robinson summary judgment on its claim it was an unenforceable non-competition agreement.

{¶61} However, our analysis under this assignment of error cannot be concluded without also considering JATC's argument that Robinson did, in fact,

breach the terms of the SLA. As set forth above, JATC not only argues that the SLA's provisions are enforceable, but also that Robinson breached the SLA by accepting work for a non-contributing employer. The trial court appears to have essentially determined that Robinson's acceptance of a job with a non-union, non-contributing employer was immaterial, at least in part because of its finding that the restrictions on employment contained in the SLA constituted an unlawful restraint on trade. Having found, however, that JATC substantially performed under the SLA and also that the repayment provision of the SLA was not an unlawful restraint on trade, we must now consider whether the trial court erred in failing to expressly find that Robinson breached the SLA.

{¶62} The pleadings and evidence below revealed, and the trial court found, that Robinson accepted employment as a general laborer with Surgent Construction in April of 2021. Surgent Construction is based in Cambridge, Ohio and was providing services to the Colgate-Palmolive facility in Cambridge. Surgent is a non-union employer and non-contributing employer. Robinson's duties there included structural steel welding, pouring and/or forming concrete, hanging or setting steel, operating heavy equipment, as well as miscellaneous tasks. The affidavit of Jeffrey Smith, the training coordinator of JATC, averred that "structural steel welding is included within the universe of craft work as set forth by the UA Constitution and Local 168's collective-bargaining agreements, as

it entails welding shapes to steel members, which is performed by pipefitters in the course of their work." Smith consistently testified in his deposition that "[s]tructural steel welding is a generic description of welding shapes of steel members, and it is done by all trades * * * [a]ll building and construction trades." Smith further affirmed in his deposition testimony that the description of the work in the plumbing and pipefitting industry described in the SLA included work in "any related building or construction trade." Robinson has confirmed that the structural steel welding he did while working for Grae-Con included the welding of I-beams. He further confirmed during his deposition that the structural steel welding he performed at Surgent also included welding of I-beams. Importantly, Robinson's deposition testimony establishes that he had received OJT for structural steel welding during his apprenticeship while working for Grae-Con.

{¶63} Thus, the record before us establishes that Surgent Construction was a non-union employer that did not contribute to the JATC affiliated with Local 168, or any other JATC. The record further establishes that Robinson's work at Surgent consisted of "structural steel welding" of I-beams, which was the exact type of work for which he received OJT credit as part of the apprenticeship at Grae-Con, and which type of work consists of work conducted *in any related building or construction trade*, as per the terms of the SLA and according to Smith, the training coordinator for JATC. These facts are not in dispute. Therefore, based

upon the record before us, we conclude that JATC established, as a matter of law, that Robinson breached the terms of the SLA when he accepted employment with Surgent Construction during the second year of his apprenticeship.

{¶64} Accordingly, we hold that the trial court erred in granting summary judgment in favor of Robinson on his claim that the repayment provisions of the SLA constituted a non-competition agreement that was an unlawful restraint on trade and therefore, was unenforceable. Further, we hold that Robinson breached the terms of the SLA when he accepted employment with Surgent, which was a non-union employer that did not contribute to Local 168's training fund, or any other union training fund. Accordingly, JATC's third assignment of error is sustained and the trial court's grant of summary judgment in favor of Robinson on this issue is reversed.

## ASSIGNMENT OF ERROR I

{¶65} We finally address JATC's first assignment of error, which contends that the trial court erred in determining that the relevant provisions of the SLA constitute an unenforceable liquidated damages penalty. Robinson contends, on the other hand, that the provisions of the agreement fail Ohio's tripartite test for liquidated damages and thus, constitute an unenforceable penalty. We initially note that we apply the same summary judgment standard already discussed above to the arguments raised under this assignment of error.

Preliminary Determinations

{¶66} Thus far, we have determined that Robinson's summary judgment arguments were affirmative defenses that were properly pleaded in his answer. As such, we have determined that Robinson's claims that JATC breached the SLA and that the SLA contained an unenforceable non-competition agreement were not waived. However, we have also determined that neither argument had any merit and thus, that the trial court erred in granting summary judgment in favor of Robinson on those two issues. Importantly, although the trial court appears to have implicitly found that Robinson did not breach the SLA based upon its finding JATC breached the SLA by failing to keep Robinson consistently employed, as well as its additional finding the SLA contained an unenforceable non-competition agreement, we have found that Robinson's acceptance of employment with Surgent did constitute a breach of the terms of the SLA. Thus, at this juncture, we are left with determinations that Robinson breached the terms of the SLA by accepting employment with Surgent and that Robinson's breach was not excused either by an unenforceable non-competition clause or by JATC's own breach.

Contract Principles

{¶67} Once again, as set forth above, " ' "[i]In order to succeed on a breach of contract claim, a party must prove the existence of a contract, the party's performance under the contract, the opposing party's breach, and resulting

damage." ' " *Zimmerview Dairy Farms, LLC v. Protégé Energy III LLC*, 2022-Ohio-1282, ¶ 55 (4th Dist.), quoting *Martin v. Jones*, *supra,* at ¶ 36, in turn quoting *DePompei v. Santabarbara, supra*, at ¶ 20.  Here, we have rejected  Robinson's arguments that certain portions of the SLA were unenforceable as an unlawful restraint on trade or because JATC's conduct constituted a prior, material breach.  Further, having found that JATC did not breach the contract by failing to keep Robinson continuously employed, we have concluded it has been established that JATC substantially performed under the contract.  Additionally, having found that Robinson's performance under the contract was not excused and that he did, in fact, breach the SLA by accepting employment with a non-union employer, Robinson's breach of the SLA has also been established.  Thus, the first three elements of a breach of contract claim have been settled.  Left to be determined, however, is the final element of the resulting damage to JATC and whether it can recover the $40,000 from Robinson that it seeks.

{¶68} " 'Generally, a party injured by a breach of contract is entitled to [the party's] expectation interest or "[the party's] interest in having the benefit of [the party's] bargain by being put in as good a position as [the party] would have been in had the contract been performed." ' " *Clifton v. Johnson*, 2019-Ohio-2702, ¶ 18 (4th Dist.), quoting *Rasnick v. Tubbs*, 126 Ohio App.3d 431, 437 (3d Dist. 1998), in turn quoting Restatement of the Law 2d, Contracts, Section 344, at 102-103

(1981). " '[T]he general measure of damages in a contract action is the amount necessary to place the nonbreaching party in the position [that party] would have been in had the breaching party fully performed under the contract.' " *Washington Cty. Dept. of Job & Family Servs. v. Binegar*, 2003-Ohio-2855, ¶ 17 (4th Dist.), quoting *Allied Erecting & Dismantling Co., Inc. v. Youngstown*, 151 Ohio App.3d 16, 2002-Ohio-5179, ¶ 62 (7th Dist.). " ' "Although a party damaged by the acts of another is entitled to be made whole, the injured party should not receive a windfall; in other words, the damages awarded should not place the injured party in a better position than that party would have enjoyed had the wrongful conduct not occurred." ' " *Sutherland v. Gaylor*, 2021-Ohio-1941, ¶ 32 (10th Dist.), quoting *Briggs v. GLA Water Mgt.*, 2014-Ohio-1551, ¶ 28 (6th Dist.), in turn quoting *Triangle Properties, Inc. v. Homewood Corp.*, 2013-Ohio-3926, ¶ 52 (10th Dist.).

{¶69} In its summary judgment decision, the trial court held that "this [was] not a suit of a lender to recover the proceeds of a 'loan' but rather an attempt to seek liquidated damages on a breach of contract claim." Robinson argued below and the trial court held that "the provision [of the SLA] that purports to entitle JATC to the entire value of the [$40,000] loan constitutes an unenforceable penalty." The trial court further held that "[b]ecause the JATC is not entitled to the damages it seeks in its breach of contract claim, the claim fails." As a result, the

trial court denied JATC's motion for summary judgment, granted summary

judgment in favor of Robinson, and awarded no damages to JATC.

Liquidated Damages Versus Unenforceable Penalty

{¶70} "[L]iquidated damages are damages that the parties to a contract agree

upon, or stipulate to, as the actual damages that will result from a future breach of

the contract." *Boone Coleman Constr., Inc. v. Piketon*, 2016-Ohio-628, ¶ 11.

"Ohio has long recognized liquidated-damages provisions as valid and enforceable

* * * as long as the provisions are not ones for penalties." *Id.* at ¶ 16. "[A]

'penalty' is ' "a sum inserted in a contract, not as the measure of compensation for

its breach, but rather as a punishment for default, or by way of security for actual

damages which may be sustained by reason of nonperformance, and it involves the

idea of punishment." ' " *Id.* at ¶ 17, quoting *Piper v. Stewart & Inlow*, 1978 WL

217430, *1 (5th Dist. June 14, 1978), in turn quoting 22 American Jurisprudence

2d, Damages, Section 213, at 298 (1965).

{¶71} "Penalty provisions in contracts are 'invalid on public policy grounds

because a penalty attempts to coerce compliance with the contract rather than

represent damages which may actually result from the failure to perform.' "

*Heskitt Ins. Agency, Inc. v. Braunlin*, 2011-Ohio-6100, ¶ 22 (4th Dist.), quoting

*Satterfield v. Adams Cty./Ohio Valley School Dist.*, 1996 WL 655789, *7 (4th Dist.

November 6, 1996), in turn citing *Lake Ridge Academy v. Carney*, 66 Ohio St.3d

376, 381 (1993). The Supreme Court of Ohio has stated that "[t]he issue of whether a contract clause provides for liquidated damages or an unenforceable penalty presents a question of law that we review de novo." *Lake Ridge Academy* at 380. *See also Satterfield v. Adams County/Ohio Valley Sch. Dist.*, 1996 WL 655789, *7 (4th Dist. Nov. 6, 1996).

{¶72} The Supreme Court of Ohio recently reaffirmed Ohio's tripartite test to determine whether a contractual provision should be considered a liquidated-damages provision or an unenforceable penalty in *Boone Coleman Constr., Inc. v. Piketon*, *supra*, at ¶ 18. The tripartite test is as follows:

> "Where the parties have agreed on the amount of damages, ascertained by estimation and adjustment, and have expressed this agreement in clear and unambiguous terms, the amount so fixed should be treated as liquidated damages and not as a penalty, if the damages would be (1) uncertain as to amount and difficult of proof, and if (2) the contract as a whole is not so manifestly unconscionable, unreasonable, and disproportionate in amount as to justify the conclusion that it does not express the true intention of the parties, and if (3) the contract is consistent with the conclusion that it was the intention of the parties that damages in the amount stated should follow the breach thereof."

*Id.*, quoting *Samson Sales*, 12 Ohio St.3d 27, syllabus. As the test is written in the conjunctive, the failure to establish the existence of any one of the three elements leads to a determination that the provision is a penalty rather than a valid liquidated damages clause.

{¶73} The Court further explained as follows in *Boone Coleman Constr.*:

> We reaffirm that Ohio law requires a court, when considering a liquidated-damages provision, to "examine it in light of what the parties knew at the time the contract was formed."  [*Jones v. Stevens*], 112 Ohio St. 43, 146 N.E. 894, at paragraph one of the syllabus; *Miller v. Blockberger*, 111 Ohio St. 798, 146 N.E. 206 (1924), paragraph one of the syllabus; Sec. Fence Group, 2003-Ohio-5263, 2003 WL 22270179, ¶ 11.  *Accord* Priebe & Sons, 332 U.S. at 412, 68 S.Ct. 123, 92 L.Ed. 32.  "If the provision was reasonable at the time of formation and it bears a reasonable (not necessarily exact) relation to actual damages, the provision will be enforced."

(Emphasis added.) *Boone Coleman Constr., supra*, at ¶ 35, quoting *Lake Ridge Academy*, *supra*, at 382.

### Legal Analysis

{¶74} Here, the repayment obligation of an apprentice in the event of a breach appears to be set forth in part in two different documents that cross-reference one another.  A document entitled "Loan Agreement Between Apprentice and Joint Apprenticeship Committee," which we have referred to throughout as the SLA, provides that JATC "will grant a Scholarship Loan to the Apprentice in those amounts established in Exhibit 1 *for the training classes during the term of the apprenticeship*[.]"  (Emphasis added).  "Exhibit 1" in turn states that the apprentice promises to pay "on demand, a Scholarship Loan in the amount of Forty Thousand Dollars ($40,000) in accordance with the terms and provisions of this Scholarship Loan Agreement * * * *as that Loan Amount*

*represents direct and indirect funds provided by JATC for a five-year term of apprenticeship.*"  (Emphasis added).

{¶75} Turning once again to the SLA, as referenced in Exhibit 1, we note that the SLA states that an apprentice assumes certain obligations, "including the obligation to repay the total Scholarship Loan made to the Apprentice by the JATC "for all the years of training[.]"  The SLA contains additional language stating that "[t]he JATC will provide training worth at least the amount loaned to the Apprentice during the 'term of the apprenticeship.' "  Again, the anticipated "term of the apprenticeship" was five years.  The SLA further provides that after an apprentice has completed the probationary period, upon a breach of the SLA by the apprentice, "all amounts due and owing on the Scholarship Loan, reduced by any credit received by the Apprentice pursuant to Paragraph 6 hereof, or by any cash payments made, will become due and payable * * *."  The SLA also provides that if an apprentice breaches the agreement during the probationary period, "the Apprentice will be liable to the JATC for any costs incurred by the JATC for the training received by the Apprentice during the probationary period."

{¶76} In its motion for summary judgment filed below, JATC argued this repayment provision did not constitute a liquidated damages provision, but instead represented its actual damages suffered, which it contended was "the remaining unpaid amount of the scholarship loan * * *."  On appeal, JATC argues that "it is

undisputed that the 'amount left on the loan' at the time of appellee's breach was $40,000." Thus, although JATC denies that the repayment provisions of the agreement constitute a liquidated damages clause, it clearly interprets this contract language to mean that if an apprentice breaches the SLA any time after his probationary period has ended, but before he has completed his five-year apprenticeship, that the apprentice must pay back the full $40,000 value of the scholarship loan, "together with interest at the annual rate of five percent (5%) compounded monthly, from the date of [the] Agreement, and all costs of collection thereof, including reasonable attorney fees and all court costs." JATC alternatively argues that assuming, without conceding, that the repayment provision in the SLA does constitute a liquidated damages clause, "Ohio courts have held that such provisions in training reimbursement contracts are enforceable."

{¶77} Robinson, however, argues that to require him to pay the full $40,000 far exceeds the actual value of the training and education that he received during the less than two-year period that he served as an apprentice and would, in effect, act as a penalty rather than an enforceable liquidated damages provision. In his motion for summary judgment, Robinson argued that the "provision [in the SLA] that purports to entitle the JATC to the entire value of the loan constitutes an unenforceable penalty." Further, as noted above, that is exactly what the trial court held. The trial court's summary judgment decision further stated that "[b]ecause

the JATC is not entitled to the damages it seeks in its breach of contract claim, the claim fails." In light of this finding, coupled with the fact the trial court essentially determined that JATC's own breach of the agreement excused Robinson's performance under the contract, the trial court awarded JATC no damages at all.

{¶78} We now turn to the tripartite test set forth above. The first prong of the test is whether the damages would be " 'uncertain as to amount and difficult of proof.' " *Boone Coleman Constr., supra*, at ¶ 18, quoting *Samson Sales, supra* at syllabus. JATC argues that it satisfies the first prong of the test because 1) it "calculated the total loan amount through a general awareness that there are 'certain costs associated with running the program,' but there is not necessarily an 'individual assessment for calculation [of the costs] by pupil' "; 2) "the JATC does not 'completely know what the costs will be' from year to year"; and 3) "the costs are estimated because they are not 'specifically tabulated' from one apprentice to the next." Robinson, however, contends that "the cost of training is neither uncertain in amount nor difficult to prove." Robinson bases his arguments on the fact that "the SLA itself contemplates calculating these costs as it states that Apprentices who leave the Program during the one-year probationary period are assessed the costs the JATC incurs in providing them training." Robinson argues, very persuasively, that "JATC's ability to calculate these costs cannot simply disappear the day after an apprentice completes the probationary period." We

agree with Robinson's arguments as to the first prong of the tripartite test and conclude that despite JATC's arguments to the contrary, if JATC can apportion training costs for the first year of the program, albeit a probationary year, it should be able to apply that same formula to apportion costs for each year thereafter.

{¶79} Although failing one prong of the test results in failure of the tripartite test as a whole, we will go on to address the second prong of the test as well. The second prong of the test is whether " 'the contract as a whole is not so manifestly unconscionable, unreasonable, and disproportionate in amount as to justify the conclusion that it does not express the true intention of the parties[.]' " *Id.* JATC argues 1) that Robinson was not forced to enter into the SLA; 2) that Robinson understood the terms of the SLA and had sufficient opportunity to review a copy of the SLA before signing it; and 3) that the record is devoid of any evidence that Robinson lacked the mental or physical capacity to enter into the SLA. Robinson argues, more directly on point, that the "stipulated damages here would be assessed regardless of when Robinson allegedly breached the SLA after the probationary period, whether it be one day or three years[,]" and he further argues that "[t]hese stipulated damages thus bear no relationship to the actual costs incurred by the JATC for the time apprentices are in the Program." Robinson argues that the damages provision in the SLA is designed to enforce compliance with the contract once an apprentice has completed the initial probationary period and is therefore

manifestly unconscionable, especially considering that he was only in the program less than two out of the five years. We agree with Robinson's arguments under this prong of the tripartite test. At the time the SLA was executed, Robinson expected to receive $40,000 worth of education and training over the next five years. It is unreasonable to conclude that the parties here intended that Robinson pay JATC $40,000, designed to represent five years' worth of education and training, should he not complete the full five years of training.

{¶80} Further, and importantly, a consideration of whether a damages provision "bears a reasonable (not necessarily exact) relation to actual damages" is relevant to an analysis of this prong of the test. *Boone Coleman Constr., supra,* at ¶ 35. As argued by Robinson, "[t]hese stipulated damages bear no relationship to the actual costs incurred by the JATC for the time apprentices are in the Program." We agree, and as discussed below, our research reveals that in the few cases we could locate involving collection efforts from apprentices who failed to complete apprenticeship programs, it appears the training committees involved in those cases did not even attempt to collect amounts exceeding the value for the training and education actually provided prior to breach. *See Joint Apprenticeship and Training Committee of Sheet Metal Workers' International Association, Local No. 9 v. Chapman*, 744 F.Supp. 1008, 1017 (D.Colo. 1990) (finding that the amount an apprentice would be required to pay "if he went non-union" was three times the

amount of lost revenues to the Trust Fund and therefore bore no relationship to the costs of the training provided, and "would be a windfall rather than a refund or a recoupment of lost revenues to the Trust Funds"). *See also, K.A. Cleaning, Inc. v. Materni*, 2006 -Ohio- 1989, ¶ 9 (6th Dist.) (finding purported liquidated damages clauses constituted a penalty in part because the damages provided for in the contract did not bear a relation to the actual damages). Accordingly, we find the purported liquidated damages provision contained in the SLA also fails the second prong of the tripartite test.

{¶81} In reaching our decision, we acknowledge that we agree with JATC that there are several federal cases that have upheld the general framework that provides for the training and education of apprentices by local unions in the various trades. Further, we accept that this is the manner in which apprentices are educated and trained and that unions must protect their investment in the apprenticeship programs. *See Maddux, supra*, at 121-122. *See also Howell, supra* at 1340. However, in almost every case cited by JATC, the apprentice at issue had already completed his apprenticeship. *See Maddux*, *supra* (Maddux did not breach until two years after he signed his last apprentice training agreement); *Howell, supra* (Howell completed his apprenticeship in 1990 and did not accept non-union employment until 1991); and *Southeastern Sheet Metal Joint Apprenticeship Training Fund v. Barsuli*, 950 F.Supp. 1406 (E.D.Wis. 1997) (Barsuli did not

breach the scholarship loan agreement until more than a year after he had

completed his five-year apprenticeship). Those are very different scenarios than

the one presently before us. JATC also cites *New Orleans Elec. Joint*

*Apprenticeship and Training Committee v. Crawford*, 986 So.2d 146 (5th Cir.

2008) as an example of a case where the apprentice was required to pay the full

amount of his scholarship loan despite the fact that he breached the agreement

prior to completing his apprenticeship. However, in *Crawford*, it appears the

apprentice completed at least 10 months or more of the final year of his

apprenticeship before being terminated from the apprenticeship program, which is

also very different from the case presently before us. *Id.* at *150.

{¶82} By comparison, *In re Rosen*, 179 B.R. 935, 99 Ed. Law Rep. 452,

Bankr. L. Rep. P 76, 450 (1995), was a case involving a union training

committee's attempt to recover costs of participation in an apprenticeship program

by its former apprentice, who was involved in bankruptcy proceedings. The

decision explains that prior to Rosen filing bankruptcy, he had participated in a

union apprenticeship program which required him to sign a "Scholarship Loan

Agreement" in which the parties "agreed that the cost of training and the amount of

the 'scholarship loan' for the nine month period in question was $3313.44." *Id.* at

937. The agreement further provided, much like the agreement at issue in the

present case, "that for the nine month period the committee would provide training

to the debtor worth at least this 'amount loaned.' " *Id.* Again, just as the

agreement in the present case, the *Rosen* agreement stated that in the event Rosen

breached the agreement by going to work for a non-union employer, "all amounts

due and owing on the 'Scholarship Loan' would be immediately due and payable."

*Id.* Rosen signed the agreement in September of 1991 and was terminated from the

program in February of 1992, which was just over halfway through the program.

*Id.* The training committee sued Rosen in state court and obtained a judgment

against him for $1,656.72 in damages, plus attorney fees and costs. *Id.* The

amount of $1,656.72 was exactly half of the amount of the scholarship loan

agreement he signed that said he would be provided with $3,314.44 over a nine-

month period and that in the event of a breach, "all amounts due and owing" on the

loan would be immediately payable. Thus, in *Rosen*, the training committee only

sought to recover the value of the education actually provided before the

apprentice breached the agreement, not the full value of the scholarship loan

agreement that was signed.

{¶83} Likewise, in *Cedar Rapids Elec. Apprenticeship Training and

Educational Trust v. Roth*, 2012 WL 5269188, *1 (N.D. Iowa 2012), in an action

seeking to enforce an arbitration award, it appears that the arbiter only awarded the

training fund its costs and expenses for the portion of the last year of the

apprenticeship that the apprentice actually remained in the program before

breaching.  More specifically, Roth signed "Scholarship Loan Agreements" on September 21, 2007, August 25, 2008, August 27, 2009, August 24, 2010, and August 24, 2011.  *Id.*  Roth was terminated from the apprenticeship program sometime after the completion of his fourth year, but after he had already signed a scholarship loan agreement on August 24, 2011, for his fifth year.  *Id.*  The arbiter awarded the Trust $2500.00 for each of the first four years of training it provided, but only awarded it $958.90 for the training provided during the fifth year of the program.  *Id.*  Those amounts were ultimately enforced by the federal court.  *Id.* at *4.  As such, this is another example of what a training program sought to recover when its apprentice failed to complete the training portion of the apprenticeship.[4]

{¶84} Thus, we are left with several federal, non-binding cases that enforce full repayment of scholarship loan agreements when a breach occurs after the training and education component of the apprenticeships were completed, or were approximately 95% completed.  Further, we are left with a few bankruptcy cases, also non-binding, that appear to illustrate that when scholarship loan agreements are breached by apprentices prior to the completion of their education and training, the training committees only appear to have sought to recoup payment for the cost of training the apprentices actually completed.  The loan agreements in the

---

[4] The court found that the Trust's claim was "for a sum certain" and thus, an evidentiary hearing was not warranted. *Id.* at *3.

bankruptcy cases appear to have contained language equivalent to that at issue regarding repayment in the event of breach, however, it appears to have been enforced differently.

{¶85} As discussed above, here the $40,000 figure allegedly represented the value of education that would be provided to Robinson *over a five-year period*. Robinson participated in the program for less than two years and thus, JATC did not provide him with the full amount of the scholarship loan. Here, there is no express language in the SLA or Exhibit 1 that labels the $40,000 figure as liquidated damages. However, considering that JATC takes the view that any breach occurring after the completion of probation but before completion of the five-year apprenticeship results in stated damages of $40,000, regardless of how many days, or months, or years that the apprentice was actually educated and trained beyond the probationary period, we conclude that the breach/repayment provision in the SLA purports to be a liquidated damages clause and further that JATC seeks to enforce it as such.

{¶86} After reviewing the record before us, which includes the pleadings, pertinent agreements, deposition transcripts, and affidavits, we have concluded that to the extent the SLA and Exhibit 1 provide that JATC is entitled to $40,000 in damages if an apprentice breaches the agreement beginning one day after the end of his probationary period up until the completion of his five-year apprenticeship,

the repayment provision of the SLA is not a liquidated damages clause and instead constitutes an unenforceable penalty. As stated above, we reach this decision, in part, because the figure of $40,000 bears no reasonable relationship to the damages JATC would have actually sustained in providing less than two-year's worth of training and education to Robinson, as opposed to five. Additionally, we have concluded that the purported liquidated damages provision here fails the tri-partite test set forth above. To the extent the provision in the SLA purports to provide for liquidated damages in the amount of $40,000 to be paid by a breaching apprentice who has failed to complete the education and training portions of his five-year apprenticeship, such a provision did not represent the intention of the parties in this case. We have further found that as the repayment provision in the SLA bears no reasonable relationship to the actual costs incurred by JATC for educating and training Robinson for less than two years, it is manifestly unconscionable and disproportionate, and is therefore an unenforceable penalty.

{¶87} Moreover, in our view, the idea that JATC somehow advanced Robinson $40,000 worth of training and education on the day he began his apprenticeship is a fiction. Had JATC advanced Robinson an actual cash loan to use to begin paying toward his education, then of course, the amount of the loan proceeds that had been dispersed to him, with attendant interest as agreed, would have been due upon breach of the agreement. However, there was nothing tangible

actually dispersed to Robinson upon commencement of his apprenticeship, beyond a promise by JATC to provide him with $40,000 worth of education and training *over the next five years*. Because Robinson only partook in less than two years of that education and training, there was nothing actually provided by JATC that it can recoup beyond the value of the training and education provided to Robinson during the time he actually participated in the apprenticeship program. JATC has not and cannot demonstrate that it incurred damages in the amount that it seeks. To declare otherwise would lead to an absurd result.

Remedy

{¶88} Here, we have concluded that requiring Robinson to pay $40,000 for five years' worth of education and training when less than two years' worth of training and education occurred bears no relationship to the actual damages JATC incurred upon Robinson's breach and therefore the repayment provision is an unenforceable penalty. Robinson argues on appeal that because the $40,000 sought by JATC was a penalty and not representative of actual damages, and because JATC failed to delineate its damages other than the full $40,000, that it is not entitled to any damages at all. The trial court appears to have either agreed with Robinson on this issue, or applied its reasoning that Robinson's performance under the contract was excused, to award JATC zero damages. However, we conclude this was an incorrect result.

{¶89} Because we have found that Robinson's performance under the SLA was not excused and that Robinson did, in fact, breach the terms of the SLA, the trial court erred in not awarding JATC any damages at all.  In reaching this determination, we reject Robinson's argument that because a purported liquidated damages clause was at issue, and because JATC only claimed damages in the full $40,000 amount of the clause, that a finding that the clause was unenforceable results in JATC receiving zero damages.  As explained in *Maddux, supra*, at 121, "[a]s society has become more mobile and the workplace more technical, workers may agree that they will reimburse the company or union for valuable training, but only up to the line of recompense.  Contractual punishment is still barred."

> "Doubtless an employer who has provided specialized training to an employee—as by a course of studies or the like—might reasonably contract with the employee for reimbursement if the employee should quit before the employer achieves any benefit. However, the employer may not require its ex-employee to make payment to it unrelated to the employer's damage, simply as a penalty to discourage or punish a job change."

*Id.*, quoting *Wilson v. Clarke*, 470 F.2d 1218 (1st Cir.1972).

{¶90} Further, as explained in Farnsworth, Contracts, determinations that some purported liquidated damages clauses may actually constitute penalties "can be traced back to the development of equitable relief in cases involving penal bonds, which were used to secure performance under contracts" in English common law courts in the 1700s.  Farnsworth, Contracts, §12.18, at 936.  (2d Ed.

1990).  Farnsworth further explains as follows regarding the remedy when a

contract provision is determined to be a penalty rather than an enforceable

liquidated damages provision:

> The principles developed in connection with penal bonds were later extended to contractual penalties of all kinds.  In this way a distinction grew in contract provisions stipulating the amount of damages between those characterized as 'penalties,' and therefore condemned, and those characterized as 'liquidated damages,' and therefore permitted.  *If a provision is condemned as a penalty, it is unenforceable; but the rest of the agreement stands, and the injured party is remitted to the conventional damage remedy for breach of the agreement.*  If the provision is sustained as one for liquidated damages, both parties are bound by it, and it displaces the conventional damage remedy for breach, whether it provides for damages that are larger or smaller than would otherwise have been awarded.

(Emphasis added).  *Id.* at 936-937.

{¶91} Farnsworth goes on to state that although the question of whether a

provision constitutes liquidated damages or an unenforceable penalty is a question

of law for the court, even " 'the ablest judges have declared that they felt

themselves embarrassed in ascertaining the principle on which the decisions

[distinguishing penalties from liquidated damages] were founded." *Id.* at 937,

quoting *Cotheal v. Talmadge*, 9 N.Y. 551, 553 (1854).  This difficulty led to the

development of tests in order to make these determinations, such as the tripartite

test set forth in *Boone Coleman Constr.* set forth above, which we have applied

herein to determine that the repayment provision at issue here constitutes a penalty.

Thus, taking into consideration the principles espoused by Farnsworth, we conclude that because the provision at issue constitutes a penalty, JATC "is remitted to the conventional damage remedy for breach of the agreement[,]" rather than being foreclosed from any recovery at all. *Farnsworth* at 936-937. As such, the trial court erred in determining that JATC was not entitled to any damages at all.

## Conclusion

{¶92} Accordingly, we overrule JATC's first assignment of error to the extent that it argues the trial court erred in determining the repayment provision in the SLA constituted an enforceable penalty. We agree with the trial court's determination that the provision at issue constitutes an unenforceable penalty. However, the trial court erred in granting summary judgment in favor of Robinson on the issue of damages because JATC was entitled to recoup its actual damages for training and educating Robinson during the actual time he spent in the apprenticeship program. Thus, we sustain JATC's first assignment of error to the extent that it challenges the damages calculation employed by the trial court. Accordingly, this matter must be remanded to the trial court for further proceedings. On remand, the trial court should determine JATC's damages due as a result of Robinson's breach without reference to the penalty clause. *See*

*Satterfield, supra*, at *7; Farnsworth, *supra*.

## JUDGMENT AFFIRMED IN PART, REVERSED IN

## PART, AND CAUSE REMANDED.

## JUDGMENT ENTRY

It is ordered that the JUDGMENT BE AFFIRMED IN PART, REVERSED IN PART, AND CAUSE REMANDED. Costs to be assessed to appellant.

The Court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this Court directing the Washington County Common Pleas Court to carry this judgment into execution.

IF A STAY OF EXECUTION OF SENTENCE AND RELEASE UPON BAIL HAS BEEN PREVIOUSLY GRANTED BY THE TRIAL COURT OR THIS COURT, it is temporarily continued for a period not to exceed 60 days upon the bail previously posted. The purpose of a continued stay is to allow appellant to file with the Supreme Court of Ohio an application for a stay during the pendency of proceedings in that court. If a stay is continued by this entry, it will terminate at the earlier of the expiration of the 60-day period, or the failure of the appellant to file a notice of appeal with the Supreme Court of Ohio in the 45-day appeal period pursuant to Rule II, Sec. 2 of the Rules of Practice of the Supreme Court of Ohio. Additionally, if the Supreme Court of Ohio dismisses the appeal prior to expiration of 60 days, the stay will terminate as of the date of such dismissal.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

Abele, J. and Wilkin, J. concur in Judgment and Opinion.

For the Court,

_____
Jason P. Smith
Presiding Judge

### NOTICE TO COUNSEL

**Pursuant to Local Rule No. 14, this document constitutes a final judgment entry and the time period for further appeal commences from the date of filing with the clerk.**